IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CLUB GRAVITY INC., et al., | ) | |
| Plaintiffs, | ) | 2:07-cv-00488-GEB-EFB |
| v. | ) | ORDER |
| MOHAMMED JACK MOGHADDAM, et al. | ) | |
| Defendants. | ) | |

Defendants City of Marysville, the Marysville Police Department, Sergeant John Osbourn, and Gary Price seek summary judgment on Plaintiffs' claims that the movants violated Plaintiffs' rights under 42 U.S.C. §§ 1981, 1983, 1986, and Plaintiffs' right to due process and equal protection under the Fourteenth Amendment of the United States Constitution.  Plaintiffs oppose the motion.  Oral argument was heard on October 20, 2008.

DISCUSSION[1]

The factual issues concerning Plaintiffs' claims involve Plaintiffs' loss of their use permit to operate Club Gravity following

---

[1] The summary judgment standard is well known and need not be repeated here.

1

law enforcement investigation of the club, which Plaintiffs allege was done for the purpose of racially discriminating against African Americans who frequented the club.

However, the uncontroverted facts show the Marysville Police Department and the Alcoholic Beverage Control ("ABC") conducted a legitimate compliance investigation at Club Gravity on July 1, 2006 to determine whether minors were unlawfully purchasing or consuming alcoholic beverages in the club.  This investigation was a follow-up to an investigation conducted by the ABC on May 5, 2006, during which eight minors were arrested for having purchased or consumed alcoholic beverages in Club Gravity and Club Gravity was cited for allowing minors to purchase or consume alcoholic beverages.  (Statement of Undisputed Facts ("U.F.") ¶¶ 3, 4, 5.)  The Marysville Police closed Club Gravity's doors on July 1, 2006, so the investigation could be conducted without interruption.  During this closure, a large number of patrons accumulated outside the club, and that crowd "became extremely angry and hostile and eventually on the verge of a full blown riot"; the crowd "quickly became unmanageable."  (Osbourn Decl. at 3:13-22.)  Further, at least some rooms inside Club Gravity were over their occupancy capacity limits.  Plaintiffs' attempt to controvert what the police officers observed about occupancy capacity limits being exceeded fails because the movants' hearsay objection to Plaintiffs' evidence is sustained.

At one point during the investigation, approximately 2000 customers were in and in the vicinity of Club Gravity; the maximum occupancy capacity of Club Gravity is 1625.  (U.F. ¶¶ 10, 11.)  The uncontroverted evidence shows the crowd assembled outside the club became so loud and rowdy that Marysville Police Sergeant Chris Sachs

1  called for additional law enforcement officers to assist in
2  controlling and dispersing the crowd.  A total of sixty-eight officers
3  dispersed the crowd.  (U.F. ¶ 16.)  The record shows the dispersal
4  decision was justified in light of the difficulty the officers had
5  controlling the crowd.

6      The Marysville Police Department temporarily closed Club
7  Gravity on July 1, 2006, due to Club Gravity's "unpredictable behavior
8  of holding large uncontrolled events without adequate notice to the
9  City."  (Osbourn Decl. at 4:25-5:4.)  Following this closure, the City
10 conducted an investigation into whether Club Gravity's use permit
11 should be revoked.  Gary Price, the City Planner, prepared a report in
12 which he documented the problems at Club Gravity and recommended
13 revocation of its use permit.  A permit revocation hearing was held
14 before the City of Marysville Planning Commission on July 26, 2006.
15 (Price Decl. at 4:24-5:4.)  Plaintiffs were given notice of that
16 hearing, along with a copy of Price's report. (U.F. ¶ 35; Trinh Decl.
17 ¶ 20.)  Plaintiffs with their counsel presented arguments and evidence
18 opposing revocation before the Planning Commission and also on appeal
19 before the City Council.  Both the Planning Commission and the City
20 Council voted unanimously to revoke Club Gravity's use permit.  (U.F.
21 ¶¶ 42, 50.)

22      Plaintiffs argue the revocation hearing was not impartial
23 because one of the members of the Planning Commission, Henry Delamere,
24 participated in the hearing even though he had excused himself from
25 the hearing on the issuance of the use permit for Club Gravity in
26 April 2003 "based on a . . . conflict of interest due to close
27 proximity between places of employment and Club Gravity."  (Trinh
28 Decl. ¶ 27.)  Delamere counters, declaring "[w]hen the proposed use

1  permit revocation came before the Planning Commission for hearing on
2  July 26, 2006, the circumstances which prompted [him] to recuse from
3  the earlier hearing had changed and [he] did not believe there was any
4  possibility of even an appearance of a conflict . . . ." (Delamere
5  Decl. 3:2-10.) Accordingly, Plaintiffs have not shown that Delamere
6  had a conflict of interest when he participated at the July 26
7  hearing.
8       Plaintiffs also argue that the hearings violate procedural
9  due process because Plaintiffs were not allowed to conduct discovery
10 or cross-examine witnesses at the hearings. (Trinh Decl. ¶¶ 58, 59.)
11 However, "[t]he fundamental requirement of due process is the
12 opportunity to be heard 'at a meaningful time and in a meaningful
13 manner.'" Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (citations
14 omitted). "The Supreme Court has also held that procedural due
15 process requires "'the right to be informed not only of the nature of
16 the charges but also of the substance of the relevant supporting
17 evidence,' but does not necessarily require 'a full evidentiary
18 hearing including the right to confront and cross-examine adverse
19 witnesses.'" Club Moulin Rouge LLC v. City of Huntington Beach, No.
20 CV 04-10546, 2005 WL 5517234, at *5 (C.D. Cal. June 22, 2005) (quoting
21 Brock v. Roadway Express, 481 U.S. 252, 264-65 (1987)). Here, the
22 uncontroverted evidence shows Plaintiffs were given an opportunity to
23 be heard in a meaningful manner since they were given notice of the
24 hearings, received a copy of Price's report before the hearings, and
25 presented their arguments before the Planning Commission and on appeal
26 to the City Council.
27      Plaintiffs also argue "Bill Simmons [a member of the
28 Planning Commission] was openly hostile towards [Plaintiffs']

4

1 representative, Scott Wippert," during the July 2006 hearing.  (Trinh
2 Decl. ¶ 26.)  However, Plaintiffs have not shown how Simmons' alleged
3 hostility deprived them of an opportunity to be heard in a meaningful
4 manner.
5          Plaintiffs further argue the revocation of Plaintiffs' use
6 permit was based on Price's report which charged Plaintiffs with
7 violations of city ordinances that occurred outside of Club Gravity's
8 "zone of influence," which was defined as a one-block radius around
9 the club in Plaintiffs' security plan; Plaintiffs were required to
10 maintain a security plan as a condition of their use permit.  (Trinh
11 Decl. ¶ 18.)  Defendants counter the terms of the use permit required
12 that the club be operated in a way that would "not be detrimental to
13 the health, safety, peace, comfort, and general welfare of persons
14 residing in or working in the neighborhood . . . or be detrimental or
15 injurious to property and improvements in the neighborhood or the
16 general welfare of the city."  (Price Decl. at 2:7-12.)  Accordingly,
17 Plaintiffs have not shown that it was improper for Price's report to
18 include documentation of violations occurring "in the neighborhood"
19 though they may be outside of Plaintiffs' "zone of influence."
20          Plaintiffs also argue Price's report constituted
21 "sandbagging" of "a year's worth of . . . violations of city
22 ordinances," and this "prevented Club Gravity the opportunity to
23 correct the situation."  (Trinh Decl. ¶ 21.)  However, the terms of
24 the use permit provided that the use permit "shall be subject to
25 revocation . . . if the [Planning] Commission finds that there has
26 been noncompliance with any of the . . . conditions [of the use
27 permit]."  (U.F. no. 24; Price Decl. Exh. A.)  The requirements of due
28 process are not as confined as Plaintiffs argue.  "'[D]ue process is

5

flexible and calls for such procedural protections as the particular situation demands.'" Mathews, 424 U.S. at 334 (citation omitted). In light of the circumstances confronting the City, due process does not require Club Gravity be given an opportunity to correct the situation involved with the use permit revocation proceedings.

Therefore, the movants' motion is granted on Plaintiffs' due process and remaining federal claims, including any federal claim alleged for the temporary closure before the use permit revocation issue was decided, since this closure does not arise to a substantive due process claim.

Before the appeal on the revocation of the use permit was heard, Moghaddam broke into Club Gravity since Plaintiffs were in default for failure to make timely mortgage payments owed to Moghaddam on their purchase of Club Gravity from Moghaddam in 2004 and changed the club's door locks. Moghaddam avers that no employee of the City assisted or authorized his actions. (Moghaddam's Verified Response to City's Request for Admissions Nos. 2, 6.) Plaintiffs have not submitted admissible evidence controverting Moghaddam's averments.

Plaintiffs reported Moghaddam's break-in actions to the Marysville Police Department, but the Police refused to intervene, stating it was a civil matter. (Trinh Decl. ¶ 29.) Subsequently, Plaintiffs attempted to break into Club Gravity, but Moghaddam, or someone acting on his behalf, reported the attempted break-in to the Marysville Police Department. (U.F. ¶ 67.) Sgt. Osbourn responded to the scene and told the parties that their dispute was a civil matter and that the Police would not intervene. (U.F. ¶ 68; Osbourn Decl. at 6:8-9.) Trinh declares Sgt. Osbourn also said he had "found a default and was awarding possession of the premises to [Moghaddam] . . . [and]

1  Osbourn threatened [Plaintiffs] with arrest if [they] did not leave."
2  (Trinh Decl. ¶ 64.)  Sgt. Osbourn declares he told the parties that
3  "the police were not going to get involved, except to keep the peace";
4  and, when Plaintiffs asked Sgt. Osbourn whether he was going to arrest
5  them, he responded, "'I hope it doesn't come to that' or words to that
6  effect."  (Osbourn Decl. at 2:8-10.)  Plaintiffs have not shown how
7  Sgt. Osbourn's alleged statement that he was "awarding possession" of
8  the premises to Moghaddam is material since Moghaddam was already in
9  the building with the locks changed.  Plaintiffs have not controverted
10 Defendants evidence showing they did not violate Plaintiffs' federal
11 rights when Defendants refused to help Plaintiffs regain possession of
12 the property.  Accordingly, the movants prevail on this portion of
13 their motion.
14         Subsequently, Moghaddam sought a demolition permit from the
15 City so he could have Club Gravity demolished.  When seeking the
16 permit, Moghaddam provided Lisa LaMont, an employee of the City of
17 Marysville Building Department, a copy of the deed on Club Gravity and
18 "advised [LaMont that he was the] owner [of Club Gravity] under
19 default."  (LaMont Decl. at 2:6-8.)  Moghaddam "assured employees of
20 the City of Marysville that [he was] entitled to be issued that
21 permit."  (Moghaddam's Verified Response to City's Request for
22 Admissions No. 12.)  LaMont declares she "had no reason to doubt
23 [Moghaddam]."  (LaMont Decl. at 2:8.)  On October 2, 2006, LaMont
24 issued the requested demolition permit to Moghaddam.  (LaMont Decl. at
25 2:11-12.)  Moghaddam then demolished Club Gravity.  (Trinh Decl. ¶
26 31.)  However, Price informed Plaintiffs' counsel about the demolition
27 permit and Plaintiffs then told the City the demolition permit was
28

1  issued in error; the City responded by rescinding the demolition
2  permit.  (Trinh Decl. ¶ 31.)
3      The uncontroverted evidence shows that LaMont negligently
4  issued the demolition permit.  "[M]ere negligence or lack of due care
5  by [municipal] officials does not trigger the protections of the
6  Fourteenth Amendment . . . ."  <u>Wood v. Ostrander</u>, 879 F.2d 583, 587
7  (9th Cir. 1989) (citing <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986);
8  <u>Davidson v. Cannon</u>, 474 U.S. 344, 347-48).  Since the movants have
9  shown their entitlement to summary adjudication of Plaintiffs' federal
10 claims concerning issuance of the demolition permit, this portion of
11 their motion is granted.
12     Plaintiffs also assert a claim for violation of 42 U.S.C.
13 § 1982 for the first time in their Opposition to the summary judgment
14 motion.  However, since Plaintiffs have not shown "good cause" to
15 justify amendment of the "no further amendments" provision of the
16 Status (Pretrial Scheduling) Order filed August 9, 2007 (Dkt. No. 35,
17 Order, at 2:5-7.), the scheduling order prevents Plaintiffs from
18 adding a new theory of liability at the summary judgment stage of the
19 proceeding.  <u>Eagle v. Amer. Tel. & Tel. Co.</u>, 769 F.2d 541, 548 (9th
20 Cir. 1985).  Accordingly, this claim is not in the action.
21     Because of the above rulings, the only remaining federal
22 claims are Plaintiffs' federal constitutional claims against
23 Moghaddam.  However, since there was no state action in connection
24 with any of Plaintiffs' claims against Moghaddam, those claims are
25 not federal claims and are dismissed. See <u>Jensen v. Lane County</u>, 222
26 F.3d 570, 575 (9th Cir. 2000) (citation omitted) (stating before a
27 private actor's conduct is considered state action, "the court must
28 find a sufficiently close nexus between the state and the private

actor 'so that the action of the latter may be fairly treated as that of the State itself.'").

Since there are no federal claims remaining in this action, the issue is reached whether supplemental jurisdiction should continue being exercised over Plaintiffs' remaining state claims. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).  Therefore Plaintiffs' remaining state claims are dismissed under 28 U.S.C. § 1367 (c)(3).  The Clerk of the Court shall close this action.

Dated:  November 18, 2008

_____
GARLAND E. BURRELL, JR.
United States District Judge